FILED
U.S. District Court
District of Kansas

OCT 19 2026

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

Clerk, U.S. District Court
By [signature] Deputy Clerk

GREGORY JACOB WEBER, Plaintiff Pro Se,

v.

Case No. 2:26-cv-02652-TC-ADM
(To be assigned by Clerk)

CITY OF CHEROKEE, KANSAS;
OFFICER JOE SUTTON, individually;
MARY JO GOEDEKE, individually;
ROBERT E. MYERS, individually;
JACOB CONARD, individually;
DEPUTY KOSMAN, individually;
DEPUTY MOUTZ, individually;
BILLY TOMASI, individually and in his official capacity as Crawford County Sheriff;
and JOHN DOES 1–5, individually as Crawford County Jail Booking Personnel,
Defendants.

JURY TRIAL DEMANDED

_______________________________________/

COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

## I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4), as this action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation of rights secured by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

2. Venue is proper in the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because all Defendants reside or operate within this judicial district, and a substantial part of the events, omissions, and illegal detentions giving rise to these claims occurred in Crawford and Cherokee Counties, Kansas.

## II. PARTIES

3. Plaintiff Gregory Jacob Weber is an individual residing in rural Crawford County, Kansas, operating Pro Se in this matter.

4. Defendant City of Cherokee, Kansas is a municipal entity operating under the laws of Kansas, maintaining administrative authority over the Cherokee Municipal Court and the Cherokee Police Department.

5. Defendant Crawford County Sheriff's Office is a political subdivision of Crawford County, Kansas and of the State of Kansas, maintaining operational control over the Crawford County Jail.

6. Defendant Officer Joe Sutton was at all material times an officer employed by the City of Cherokee Police Department, acting under color of state law, sued in his individual capacity.

7. Defendant Prosecutor Mary Jo Goedeke was at all material times the designated prosecutor for the City of Cherokee, acting under color of state law, sued in her individual capacity.

8. Defendant Attorney Robert E. Myers is a private attorney licensed to practice law in Kansas, who actively acted under color of state law by engaging in a joint, conspiratorial enterprise with state actors to deprive Plaintiff of constitutional rights, sued in his individual capacity.

9. Defendant Attorney Jacob Conard is a private attorney licensed to practice law in Kansas, who actively acted under color of state law by joining and perpetuating the ongoing defense conspiracy to suppress evidence, manipulate dockets, and deny Plaintiff access to the courts, sued in his individual capacity.

10. Defendant Deputy Kosman was at all material times a deputy employed by the Crawford County Sheriff's Office, acting under color of state law, who actively executed retaliatory historical background enforcement and profiling, and who actively participated in the

extra-jurisdictional seizure and issued threats of physical violence, sued in his individual capacity.

11. Defendant Deputy Moutz was at all material times a deputy employed by the Crawford County Sheriff's Office, acting under color of state law, who actively executed retaliatory historical background enforcement and profiling, sued in his individual capacity.

12. Defendant Sheriff Billy Tomasi is sued in his individual capacity as an officer and his official capacity as the elected Sheriff of Crawford County, Kansas, maintaining administrative control over the Crawford County Jail.

12a. Defendants JOHN DOES 1–5 were at all material times booking deputies, intake guards, or intercom operators employed by the Crawford County Sheriff's Office, acting under color of state law, who actively enforced the unconstitutional weekend blackout, falsified bond data over the intercom, and executed the degrading sanitary deprivations against Plaintiff, sued in their individual capacities.

III. STATEMENT OF FACTS

A. The Initial Commercial Stalking, Profiling, and Jurisdictional Hypocrisy

12b. Several years prior to the events of November 2025, Plaintiff was completing his evening shift and executing standard commercial closing procedures at his primary place of employment at the edge of the city limits of Pittsburg, Kansas. As Plaintiff was physically locking the exterior front entrance door, a Crawford County Sheriff's deputy—whom Plaintiff now reasonably identifies as Defendant Deputy Moutz due to his highly distinctive full red beard—abruptly pulled his patrol unit into the business perimeter and aggressively approached Plaintiff under color of authority.

12c. Plaintiff explicitly notified the red-bearded deputy that he was an authorized employee,

possessed the physical keys to the commercial facility, and was actively securing the building for the night, ordering the deputy to vacate the property. Defendant Deputy Moutz flatly refused to vacate the commercial site. Utilizing a hostile, coercive posture designed to imply immediate criminal incarceration if Plaintiff chose to exercise his constitutional right to silence, Defendant Deputy Moutz aggressively declared under color of authority: "I don't need to see your keys, I need to see your ID."

12d. Under severe duress and vocal protest, Plaintiff surrendered his state identification card. Defendant Deputy Moutz executed an unauthorized background system query on Plaintiff's name, and ultimately returned the card while issuing a calculated verbal taunt, stating he and the Sheriff's Office were "patrolling hot and heavy."

12e. Plaintiff rightfully exercised his First Amendment rights, directly rebuking the deputy's bad-faith intrusion by stating: "Security is my responsibility, not yours." Plaintiff's verbal rebuke was explicitly driven by the agency's documented custom of systemic neglect; merely weeks prior, the Crawford County Sheriff's Office dispatch had explicitly refused to deploy a single car to respond to a call regarding a physical break-in at that exact business facility, dismissively claiming to management that the commercial property was strictly a "city police matter." This encounter permanently cements the true chronological origin of personal friction, retaliatory profiling, and explicit extra-procedural territorial trespass by the red-bearded Defendant Deputy Moutz against Plaintiff.

B. The Subsequent Cornfield Confrontation and Hood-Striking Seizure Command

12f. Approximately six months after the commercial stalking incident, Plaintiff's horse accidentally escaped its enclosure due to a broken wire fence. A Crawford County Sheriff's deputy, whom Plaintiff reasonably identifies as Defendant Deputy Kosman,

arrived at the last known sighting of the animal at an unrelated property owner's cornfield.

12g. It was approximately sundown, and the horse was completely out of sight deep within the standing crops. Defendant Deputy Kosman, acting under color of authority, aggressively demanded that Plaintiff immediately launch a physical entry into the field to pursue the animal.

12h. Plaintiff rightfully exercised his sound judgment, vocally objecting to the lawless directive. Plaintiff notified the deputy that because the animal was out of sight and the light was fading, a blind pursuit would inflict massive, unnecessary crop damage across private property and create an immediate physical safety hazard.

12i. Enraged by this protected verbal challenge to his command, Defendant Deputy Kosman aggressively stepped forward and used his fist to violently knock on the hood of Plaintiff's private vehicle while repeating his lawless demand to force a non-consensual entry. When Plaintiff steadfastly maintained his refusal to capitulate to the physical intimidation, Defendant Deputy Kosman ultimately left.

C. The 2023 Private Yard Intrusion and Multi-Agent Confiscation Threat

13. In the early morning hours of a day in 2023, Plaintiff's horse accidentally escaped its enclosure through a neighbor's border fence in rural Crawford County, Kansas. Plaintiff successfully corralled the animal in this adjacent neighbor's pasture by temporarily shifting some of the neighbor's unanchored livestock panels. To allow the fatigued animal to rest, Plaintiff returned to his residence to sleep.

14. Upon waking, Plaintiff observed a Crawford County Sheriff's deputy cruising slowly in a marked squad car directly in front of his home. Suspecting the horse may have breached the perimeter again, Plaintiff approached the cruiser to inquire. The deputy, reasonably

identified as red-bearded Defendant Deputy Moutz, claiming to possess no prior personal identification or knowledge of Plaintiff, stated under color of authority that he was actively searching for a "Mr. Weber" on a complaint of criminal trespass initiated by the neighbor.

15. Plaintiff vocally challenged the assertion, immediately identified himself as the individual in question, and notified Defendant Deputy Moutz that the neighbor was fabricating a dispute, that Plaintiff had spent half the night safely securing the animal, and that the deputy was already facing an administrative complaint. Defendant Deputy Moutz stated he would speak further with the neighbor and drove down the road to do so.

16. Shortly thereafter, an entirely separate, second Crawford County Sheriff's deputy arrived on the scene and entered directly onto Plaintiff's private yard, acting under color of authority. Plaintiff rightfully exercised his constitutional right to reject the lawless presence, explicitly informing this second deputy that he was trespassing on private property and ordering him to leave the yard. The second deputy flatly refused to leave the private property.

16a. While the second deputy defiantly maintained his trespass, Defendant Deputy Moutz arrived back at the scene and immediately stepped out of his patrol vehicle to join the second deputy on Plaintiff's private lawn. Standing together on private property, both deputies hostilely demanded that Plaintiff immediately retrieve his horse from the neighbor's yard, explicitly issuing a joint threat of a state-sanctioned confiscation of the animal if the command was not obeyed on their timeline.

16b. Plaintiff initiated a series of repeated verbal demands requiring the deputies to immediately contact and summon the County Sheriff himself or connect him directly via

telephone to address the lawless private yard invasion. The deputies flatly refused the supervisor mandate, mockingly stating under color of authority: "You call him." When Plaintiff continued to object to their presence, the deputies aggressively declared: "You don't get to tell us what to do." The deputies ultimately departed the private lawn while issuing an explicit threat to execute a forced confiscation of the animal later that evening. Plaintiff bypassed the bad-faith curfew and successfully retrieved his horse safely that afternoon without further incident.

16c. This complete operational history establishes that Defendant Deputy Kosman and Defendant Deputy Moutz operated on separate chronological tracks, maintaining distinct layers of personal friction with Plaintiff, and were never physically deployed in the same geographic location until their multi-agency timelines violently intersected on the highway shoulder corridor on November 22, 2025.

16d. While Plaintiff does not currently possess a physical video copy of this 2023 interaction due to ongoing records concealment by Defendants, the encounter is fully corroborated by multi-witness testimony and explicitly referenced on law enforcement audio recordings captured during the subsequent 2025 arrest.

D. The October 25, 2024 Retaliatory Extra-Jurisdictional Interception

17. On October 25, 2024, Cherokee municipal police officer Defendant Joe Sutton initiated an unlawful cruiser pursuit from blocks away, chasing Plaintiff completely outside city limits while Plaintiff was operating a sub-50cc scooter. Defendant Sutton initiated this stop based on a fabricated pretext, alleging a stop sign violation despite Plaintiff yielding to cross-traffic.

18. Defendant Joe Sutton aggressively demanded a driver's license, vehicle registration, and

proof of insurance, despite sub-50cc scooters being strictly exempt from these requirements under Kansas law pursuant to K.S.A. 8-126 and K.S.A. 8-1439a.

19. When Plaintiff rightfully asserted his legal exemptions, Defendant Sutton threatened immediate incarceration for a non-jail offense, stating under color of authority:"You are going to jail for failure to ID " and "You are going to be in handcuffs and it is all your fault because you gave me attitude," followed by: "I can arrest you for whatever I want."

20. Following protected verbal speech by the Plaintiff, Defendant Sutton drew pepper spray, handcuffed Plaintiff, detained Plantiff in his cruiser for several minutes, and executed an illegal, warrantless search of the scooter under the false pretext of checking if it was stolen. Upon receiving a negative dispatch query, Defendant Sutton released Plaintiff from custody, stating: "Hope you learned your lesson." When Plaintiff inquired if this was the way Defendant Sutton welcomed visitors to his city, Defendant Sutton replied "You're always welcome in Cherokee." This initial encounter established an ongoing, documented personal animus and retaliatory motive by local law enforcement.

E. The November 22, 2025 Extra-Jurisdictional Arrest, Theft, and Armed Threats

21. On the afternoon of November 22, 2025, Plaintiff was operating exclusively as a pedestrian, walking legally on foot eastward along the shoulder of the US400 Federal highway right-of-way after legally crossing the unmarked intersection of the K7 state highway. No sidewalks or crosswalks exist anywhere at either highway location.

22. The official urban boundary sign identifying the city limits of Cherokee, Kansas is positioned strictly on the north edge of the US400 Federal highway east-west right-of-way corridor, directly above an official traffic control sign reading "Crawford County Line." An additional official traffic control sign reading "Cherokee County Line"

is positioned directly opposite on the south edge of the US400 Federal highway right-of-way corridor. Because the geographic boundary line runs between these markers along the east-west right-of-way, and because Plaintiff was physically walking eastward on the north shoulder—positioned well south of the north right-of-way boundary line and south of the City of Cherokee and Crawford County signs—Plaintiff was physically positioned entirely outside the territorial jurisdiction of the City of Cherokee and Crawford County, and entirely inside neighboring Cherokee County, Kansas at all material times, stripping the municipal officer Defendant Joe Sutton and responding Defendant Deputies Kosman and Moutz of any statutory authority.

23. A municipal police officer from the City of Cherokee, Defendant Officer Joe Sutton, operating an unmarked cruiser with no readily visible police insignia—possessing only a tiny shield sticker seen in bodycam video near the top of the fender, initially obscured from view, and not apparent to the Plaintiff—crossed the county boundary line into Cherokee County, approached Plaintiff, and rapidly, repeatedly demanded: "What are you doing?" without identifying himself as a municipal police officer.

24. Plaintiff responded: "What does it look like I'm doing?" Defendant Officer Sutton replied: "Looks to me like you're jaywalking." Plaintiff exercised his constitutional right to ignore the non-mandatory inquiry from a stranger and dismissively walked away. In direct retaliation for this protected silence and the challenge to his extra-jurisdictional authority, Defendant Officer Sutton executed a hazardous U-turn, blocking oncoming traffic, to force a physical pedestrian interception outside his lawful territory. This intitial conversation was intentionally muted by Defendant Officer Sutton. The audio recording resumed once he executed his hazardous U-turn to pursue Plaintiff.

25. Upon stopping Plaintiff, Defendant Officer Sutton commanded Plaintiff to keep his hands out of his pockets and stated: "You and me are going to have a little conversation." Plaintiff asked if Defendant Officer Joe Sutton was the same individual who had unlawfully hassled him downtown previously. Defendant Officer Sutton claimed he did not remember Plaintiff and asked: "What's with the attitude?" Plaintiff asked if it was a crime to have an attitude. Defendant Officer Sutton responded: "No, but jaywalking is a crime." Plaintiff corrected the officer's legal definition, noting it is only an infraction if outside a marked crosswalk. Plaintiff inquired if they were inside city limits. Defendant Officer Sutton falsely confirmed they were. Plaintiff then said: "Alright then, let me be on my way."

26. Defendant Officer Sutton refused and demanded Plaintiff's name. Plaintiff explicitly invoked his right to silence, stating he was done talking to the officer and would remain right where he was until the County Sheriff arrived on scene. Defendant Officer Sutton explicitly threatened to arrest Plaintiff for "obstruction" if he did not surrender his name. Plaintiff replied that he could give his name and Defendant Sutton would run his fraudulent show like last time, but that Defendant Sutton was now in deep legal trouble, again demanding the Sheriff's presence.

27. In immediate retaliation for this verbal criticism, Defendant Officer Sutton grabbed Plaintiff's arm, violently twisted it, pulled his Taser, handcuffed Plaintiff, and aggressively pushed him toward the cruiser. Upon executing the physical arrest, Defendant Sutton issued a calculated verbal taunt, stating verbatim on the active recording: "Well, here's the bad thing. You don't need ID to go to jail, but you need it to get out."

28. Plaintiff vocally protested the lawless arrest, stating he had a live dog in his vehicle to care for, that the officer had unlawfully arrested him previously, and that Plaintiff had filed a formal federal complaint with the FBI. When Plaintiff reiterated his 2024 inquiry about the way the City of Cherokee treats visitors , Defendant Sutton flatly replied: "You're always welcome in Cherokee." Plaintiff stated that he certainly did not feel welcome now. Plaintiff further stated that Defendant Sutton's lawless methods were the exact reason Plaintiff's cousin was killed by law enforcement in a widely reported incident, asking if this escalation was Defendant Sutton's idea of keeping people safe, Defendant Officer Sutton claimed he was "all about keeping people safe." Plaintiff then asserted: "My safety is not your responsibility" Defendant Sutton pressed: "Why do you need the Sheriff?" Plaintiff responded: "I don't feel safe with you."

29. Defendant Officer Sutton then falsely claimed the arrest was an accommodation, stating Plaintiff was going to jail "because you asked to see the Sheriff, and the Sheriff is at the jail." Defendant Sutton asked if Plaintiff even possessed identification. Plaintiff stated his ID was locked inside his stationary vehicle located across the highway. Defendant Officer Sutton forced Plaintiff into the rear of the cruiser, drove across the highway to Plaintiff's locked vehicle, and subsequently ran Plaintiff's license plate over the radio.

30. The Precise Vehicle Placement and Bank Camera Coverage: Plaintiff's vehicle was legally parked and stationary entirely inside the marked lines of the commercial bank parking lot, positioned in direct, unobstructed line-of-sight of one of the bank's outdoor security surveillance cameras. This commercial security system appears to utilize a standard, motion-activated recording protocol, causing the visual recording files to automatically pause during periods of physical inactivity and instantly resume filming

upon detecting any physical movement within the parking lot perimeter.

30a. The Absolute Absence of Criminal Intent and Open Camera Placement: The physical placement of Plaintiff's vehicle stands as an absolute, common-sense contradiction to Defendant Sutton's fabricated, bad-faith pretexts of suspicious or criminal behavior. Had Plaintiff engaged in an "unnatural" or illicit venture—or posed any active "issue at the bank" as Defendant Officer Joe Sutton wildly speculated in his narrative—Plaintiff would not have deliberately maneuvered and parked his vehicle directly inside the marked lines of the commercial bank lot, positioned openly in full, unobstructed line-of-sight of a prominent, motion-activated security surveillance camera. This placement conclusively demonstrates a total absence of criminal intent, establishing that Plaintiff was operating as a completely transparent, law-abiding citizen before being subjected to a targeted multi-agency fishing expedition.

31. After Defendant Officer Sutton ran Plaintiff's license plate and Plaintiff's name was broadcast over the law enforcement radio, Plaintiff explicitly notified the officer that all registration and compliance metrics were completely current on the vehicle, expressing that law enforcement did not need to touch or alter the vehicle in any manner.

31a. The "Unnatural" Profiling and Falsified Suspicions: To manufacture a retroactive, bad-faith justification for the extra-jurisdictional pedestrian stop, Defendant Officer Joe Sutton explicitly documented in his official written incident report that while it is entirely "common to see pedestrians in the area," Plaintiff supposedly "appeared to have not shopped at the local store." Defendant Sutton utilized highly subjective, unconstitutional labeling to profile Plaintiff, describing his legal pedestrian gait on the highway shoulder as appearing "unnatural" and "disoriented."

31b. Fabricated Bank Suspicions and the Rock-Throwing Pretext: Defendant Sutton further asserted in the written record that he sought to force physical contact with Plaintiff due to unspecified, completely unverified "issues at the bank," alongside a fabricated pretextual suspicion that Plaintiff "might be throwing rocks"—while explicitly conceding in the very next sentence of the written report that he "did not see [Plaintiff] throw anything."

32. Disregarding this explicit notification, Defendant Officer Sutton and responding Crawford County Defendant Deputies Kosman and Moutz are captured on multi-agency video actively laughing, looking at, and tapping their watches to enforce an administrative blackout. Defendant Officer Sutton explicitly confessed his retaliatory, lawless motive on the active recording, stating verbatim to the fully restrained Plaintiff: "We are way past a warning. This would have been a cool story 15 minutes ago. This could have been a quick see-you-later if you had not walked away from me. Because of your attitude, walking away, and not answering my questions, I'm probably going to go ahead and just take you to jail. I'm going to need your key and your ID from your vehicle, but I'm not going to let you reach for it. I'll unlock it and I'll do it. I'm going to ask you one last time, will you identify so that I can cut you a ticket for jaywalking?" Shortly before executing transport, Defendant Officer Sutton explicitly exposed his shifting, manufactured pretexts, admitting to Plaintiff on camera: "At first, I was just checking to see if your car broke down, see if you're ok. But then you came up with this attitude and started walking away. You started giving me this crap about calling the Sheriff."

32a. The Post-Arrest Bank Robbery Taunt: This calculated sequence of shifting, bad-faith pretexts was completely exposed during the physical interception. Immediately following Defendant Sutton's recorded admission that he was executing the arrest because of

Plaintiff's "attitude, walking away, and not answering my questions," Defendant Officer Sutton hostilely launched into a speculative, bad-faith accusation to mask his total lack of probable cause, replying verbatim to the fully handcuffed, protesting Plaintiff: "I don't know if you just robbed a bank or what. That's what I told you, I'm stopping you for jaywalking" This recorded statement provides definitive proof that Defendant Officer Joe Sutton had zero active knowledge of any crime, demonstrating that the extra-jurisdictional seizure was a speculative fishing expedition executed entirely in retaliation for protected speech.

33. Following this explicit admission of an intent to execute a lawless entry, Defendant Officer Sutton, with the encouragement of both Defendant Deputies Kosman and Moutz, used physical force to reach into Plaintiff's pocket, extracted the keys to his locked, stationary vehicle, bypassed the warrant requirement, and entered the automobile without consent or probable cause.

33a. Automated Extraction and Car Entry Capture: Consequently, when Defendant Officer Joe Sutton approached the locked vehicle, bypassed the warrant requirement, and used the keys to execute the lawless entry, the bank's motion-activated surveillance camera automatically triggered. The resulting unedited commercial video file captures a definitive, timestamped visual record of Defendant Sutton's physical approach, his unauthorized use of the key, and his invasive, warrantless search of the interior cabin assets, stripping all Defendants of the capability to claim the vehicle entry was a routine administrative inventory.

33b. Multi-Agency Key Extraction Facilitation and Authorization: Throughout this lawless vehicle approach, both responding Crawford County Sheriff Defendant Deputies Kosman

and Moutz actively stood by, sanctioned, and encouraged Defendant Officer Joe Sutton's warrantless extraction of Plaintiff's vehicle keys, removal of his hat and subsequent entry into the stationary vehicle. Defendants Kosman and Moutz explicitly provided institutional authorization for the warrantless property invasion, laughing amongst themselves while Defendant Moutz stated "You can take everything out of his pockets, he's under arrest ", thereby allowing and assisting the illegal search as Defendant Sutton declared on the active multi-agency recording: "I'll tell you right now, you're in my custody, that's how it's working."

33c. This explicit verbal command provides definitive physical evidence of a joint, multi-agency enterprise. It proves that the Crawford County Sheriff's Office did not merely act as passive observers, but actively directed, authorized, and facilitated the warrantless Fourth Amendment trespass and asset conversion on the commercial bank parking lot, directly stripping Defendant Deputy Kosman of qualified immunity for authorizing a clearly established constitutional violation .

F. The Facially Unconstitutional and Self-Incriminating Municipal Police Narrative

33d. The official investigative narrative authored by Defendant Officer Joe Sutton stands as a definitive, facially self-incriminating record that establishes a total absence of probable cause, confirms a pattern of selective profiling, and explicitly documents a series of shifting pretexts manufactured to punish protected First Amendment speech.

33e. The Crime of "Atypical Mannerisms" and Non-Commercial Walk: Defendant Sutton explicitly admits in the written record that his initial decision to target and pursue Plaintiff on the highway shoulder was not based on the observation of any criminal act, but on highly subjective, unconstitutional aesthetic profiling. Defendant Sutton

documented that Plaintiff's legal pedestrian gait was "inconsistent with typical pedestrian traffic" solely because Plaintiff "displayed no obvious signs of having shopped at Dollar General," and because his "mannerisms were unusual," his "gait was wide," and his "arm swings were exaggerated". Under clearly established Supreme Court precedent, walking with a wide gait or failing to purchase goods at a local storefront does not constitute reasonable articulable suspicion of a crime.

33f. The Fabricated Rock-Throwing Concession: To manufacture a retroactive safety hazard, Defendant Sutton documented a suspicion that Plaintiff "might be preparing to throw a rock at a passing vehicle". However, Defendant Sutton permanently neutralized his own pretext in the very next sentence by explicitly conceding: "He did not throw anything and continued walking south". Defendant Sutton further exposed this narrative as a complete bad-faith fabrication when he later documented the actual physical recovery of the objects from Plaintiff's hand, revealing they were strictly regular automotive scrap debris—"a wheel weight, rusted bolt, and a few worn nuts"—which Plaintiff was lawfully clearing from the roadway shoulder so he would not later run over them with his own vehicle Plaintiff actually possessed one deck screw and a few automotive wheel weights.

33g. The Community Caretaking Shift-Pretext Admission: Defendant Sutton's report hardcodes the exact verbal admission captured on the roadside recording, proving his initial law enforcement intrusion was a non-mandatory welfare check that instantly escalated into an armed custodial arrest solely because Plaintiff exercised his right to walk away. Defendant Sutton explicitly documented that he verbally stated to Plaintiff: "I did not want to write him a citation for jaywalking and that my initial intent was simply to check on him". Defendant Sutton's written record proves that the moment Plaintiff chose

to ignore the voluntary welfare inquiry and remain silent, Defendant Sutton converted a consensual encounter into an unconstitutional, retaliatory seizure under the guise of an infraction.

33h. The Absence of Valid Exigent Circumstances for the Vehicle Trespass: Defendant Sutton's report permanently disqualifies any defense that the warrantless vehicle entry was executed as a rapid emergency search for a hidden animal or identification. Defendant Sutton explicitly documented that before he ever touched the locked vehicle, Plaintiff openly communicated the location of his credentials and the animal, stating his ID was in his car and directly directing the officer's attention to the stationary Jeep near the bank. Furthermore, Defendant Sutton explicitly ran Plaintiff's license plate over the dispatch radio and received positive system confirmation linking the vehicle registration directly to Plaintiff's exact legal name—identifying him as a clear, registered owner before a single car door was breached.

33i. The Facially Documented Warrantless Search of the Backseat Baggage: Defendant Sutton openly confessed to executing an invasive, evidentiary search of Plaintiff's interior cabin assets that went far beyond a standard vehicle identification look-up or animal rescue. Defendant Sutton documented that he bypassed Plaintiff's vehicle threshold, reached directly into the back passenger cabin, and targeted enclosed property, writing verbatim: "I observed his wallet in a bag in the Jeep's backseat and retrieved it". This written admission proves that Defendant Sutton executed a full-scale, warrantless search of closed personal effects inside a locked vehicle parked on private commercial property without a warrant, consent, or a shred of valid probable cause.

34. The Facially Self-Incriminating Police Report: To retroactively sanitize this retaliatory

encounter and shield the municipal and county actors from civil liability, Defendant Officer Joe Sutton documented in his subsequent official written police report that Plaintiff had never previously interacted with Defendant Deputy Moutz, and further asserted that Defendant Deputy Moutz possessed zero recollection of ever interacting with Plaintiff.

35. This written assertion stands in direct, uncontradictable conflict with the historical reality of Defendant Deputy Moutz physically invading Plaintiff's private property in rural Crawford County in 2023. Defendant Officer Joe Sutton willfully fabricated this entry to mask the fact that the red-bearded deputy standing on the highway shoulder was the exact individual from the 2023 encounter, thereby attempting to obscure the historical multi-agency animus from judicial review. Furthermore, despite possessing personal knowledge of his prior 2023 confrontation with Plaintiff, Defendant Deputy Moutz stood by in complete, muted silence on November 22, 2025, willfully abdicating his constitutional duty to intervene to halt Defendant Officer Joe Sutton's lawless, extra-jurisdictional arrest.

35a. The Memory Contradiction and Acknowledged Animus: To further establish the bad-faith, retaliatory nature of the pedestrian interception, the official incident report authored by Defendant Officer Joe Sutton contains a profound administrative contradiction regarding his knowledge of Plaintiff. Defendant Sutton documented that the instant that Plaintiff vocally protested the lawless arrest by referencing the tragic death of his cousin at the hands of law enforcement, Defendant Sutton suddenly recalled their extensive prior adversarial interaction from October 2024.

35b. This admission stands in immediate, fatal conflict with Defendant Sutton's simultaneous

written assertion within the exact same report maintaining that Plaintiff was "unfamiliar to him". This textual paradox provides definitive physical proof that Defendant Officer Joe Sutton possessed active, personalized knowledge of Plaintiff's identity and past protected legal challenges to local authority, exposing that his on-scene claims of complete unfamiliarity were a manufactured deception designed to mask a targeted, retaliatory tracking operation under the guise of an accidental roadside contact.

36. During this unlawful search, Defendant Officer Sutton converted Plaintiff's wallet containing a large sum of physical cash currency, removing it from the scene without lawful justification. The officer additionally seized Plaintiff's dog from the vehicle. Despite explicit requests to allow Plaintiff's available relative to pick up the animal immediately, the officer stated that Plaintiff could "call from the jail."

37. Defendant Officer Sutton subsequently abandoned the live animal inside a crate with no food or water outside a completely unstaffed veterinary clinic several miles north in the county seat, leaving the animal exposed and endangered to enforce an absolute administrative blackout. The animal was only recovered after Plaintiff's relative traveled to and located the closed facility following the booking call.

38. Defendant Officer Sutton and responding Crawford County Sheriff Defendant Deputies Kosman and Moutz actively plotted methods to have Plaintiff's vehicle towed, explicitly refusing direct requests to allow Plaintiff's primary relative to take immediate possession. On the afternoon of November 22, 2025, neither of Plaintiff's relatives had any knowledge of where the vehicle or its key had been deposited by Defendants. The relatives spent a significant period of time and resources driving to and around the city attempting to locate the vehicle. When they finally initiated an intercom inquiry at the

Crawford County Sheriff's Office to ask about the vehicle's location and the retrieval of the keys, they were met with extreme hostility and a flat, administrative refusal to offer any assistance in obtaining the keys or securing the vehicle.

39. Although Plaintiff's relatives ultimately located the vehicle on their own on the bank property, they were completely unable to retrieve or protect the asset without the proper keys. Law enforcement deliberately family-blocked the asset and intentionally abandoned the locked vehicle (valued in excess of $40,000.00) on private property without authorization, ensuring it remained stranded, vulnerable, and unlawfully converted throughout the 50-hour hold.

40. While fully handcuffed and seatbelted in the rear seat of Defendant Officer Sutton's municipal squad car, Plaintiff utilized his mobile phone to initiate an emergency call to log the event. Upon discovering the live transmission, Defendant Officer Sutton aggressively flung open the cruiser door to roughly snatch the phone directly from Plaintiff's lap, while Plaintiff vocally protested, shouting: "You don't touch my shit, man. That's private property!"

41. Defendant Officer Sutton rapidly stabbed his finger onto the screen to disconnect the call. Plaintiff's private data was protected solely because the device's automatic screen-lock triggered after 30 seconds of inactivity, preventing a further warrantless data search after Defendant Sutton deposited the seized phone onto the vehicle roof.

42. Multi-Agency Retaliatory Fusion and Verbatim History Admissions: Following the vehicle entry, Defendant Deputy Kosman returned directly to his patrol vehicle to run an administrative query on Plaintiff's background history. This lookup was directly triggered by Plaintiff stating on the scene that he actively remembered a deputy previously coming

onto his yard and hassling him over his escaped horse in 2023, specifically noting on the recording that the individual possessed a distinctive red beard. Defendant Deputy Moutz is captured on multi-agency video actively possessing a prominent red beard. Plaintiff had no knowledge of the specific names of either responding deputy until subsequently reviewing the falsified police report over a month later.

43. Upon confirming Plaintiff's background via the computer query, Defendant Deputy Kosman returned to the squad car and hostilely demanded: "Did your fucking horse ever get out?" Plaintiff confirmed that the horse had escaped previously, but that he had personally taken care of the matter. Defendant Deputy Kosman explicitly linked the agency's current severe enforcement actions directly to Plaintiff's past history and verbal criticisms, stating verbatim on the active recording: "Well, if your fucking horse keeps getting out, then we'll keep getting called." Defendant Deputy Kosman aggressively added that local law enforcement had been "more than fair" to Plaintiff and that he kept getting away with warnings, explicitly declaring: "You'll never get another warning from me."

44. Immediately following this admission, Defendant Officer Joe Sutton recounted the details of his October 2024 extra-jurisdictional scooter arrest to the listening Defendant Deputies Kosman and Moutz. In response, Defendant Deputy Kosman laughed out loud and stated verbatim on the active recording: "If it had been me, I'd have towed your shit!"

45. Multi-Agency Historical Gaslighting and Systems Deception: Upon hearing Plaintiff identify the red-bearded deputy from the 2023 private property intrusion, Defendant Deputy Kosman actively engaged in a campaign of on-scene gaslighting and administrative deception to protect Defendant Deputy Moutz. Defendant Deputy Kosman

laughed aloud, mockingly telling Plaintiff to "get your shit straight" before leveling such an accusation against a law enforcement officer, further claiming under color of authority that he had executed a comprehensive digital system query and found absolutely no record or log documenting any prior law enforcement interaction between Plaintiff and Defendant Deputy Moutz. This verbal assertion was designed to manufacture a false administrative record on scene, directly facilitating Defendant Officer Joe Sutton's subsequent fabrication of the official written police report.

46. The Supervisor Call and the Derivative Authority Threat: In response to the ongoing multi-agency escalation, Plaintiff initiated an explicit verbal demand on the active recording, requiring Defendant Sutton, Defendant Kosman and Defendant Moutz to immediately contact and summon the Crawford County Sheriff himself to the scene. Defendant Deputy Kosman aggressively rejected the request, utilizing the Sheriff's specific name to amplify an atmosphere of armed intimidation and corporate backing, stating verbatim on the active multi-agency recording: "Oh, you wouldn't want me to get [Defendant Sheriff Billy Tomasi] out here, when he finds out what's going on, he's going to chew your ass harder than I will." This recorded interaction provides definitive proof that Defendant Deputies Kosman and Moutz actively utilized the corporate weight and personal backing of Defendant Sheriff Billy Tomasi as an explicit tool to terrorize a captive pedestrian.

46a. The Excessive Force Extraction Threat: Following the seizure of Plaintiff's cell phone and Plaintiff's immediate protest, Defendant Deputy Kosman physically positioned himself within the open rear doorway of Defendant Joe Sutton's vehicle next to Defendant Sutton and issued a direct, malicious threat of physical violence to the

completely handcuffed and seatbelted Plaintiff, shouting verbatim: "If you want to get out of the car and be on the ground when we do it, we can do that!" This statement provides explicit evidence of an excessive force posture, demonstrating an immediate intent to execute an extra-procedural, retaliatory physical extraction of a restrained captive solely to punish him for his protected verbal speech.

47. The Explicit Abdication of Constitutional Duty: Immediately following Plaintiff's vocal protests regarding the lawless extra-jurisdictional seizure, Defendant Deputy Kosman explicitly disclaimed his independent constitutional duty to intervene, stating verbatim on the active multi-agency recording: "Whatever happens to you is entirely up to [Officer Joe Sutton]." This statement constitutes an explicit, recorded confession of a total abdication of the deputy's clearly established legal obligation to protect a citizen from an unlawful, extra-jurisdictional arrest happening in his immediate presence.

48. The Multi-Agency Custodial Transfer and Agreement: As Defendant Officer Joe Sutton prepared to enter his patrol cruiser to execute the unlawful transport of Plaintiff to the detention facility, Defendant Deputy Kosman explicitly reinforced their coordinated action and joint custodial agreement. Defendant Deputy Kosman stated verbatim to Defendant Officer Sutton on the active recording: "Let me know if you need anything at the jail." This statement provides explicit physical evidence of a multi-agency agreement and joint enterprise, proving that the Crawford County Sheriff's Office did not merely act as passive observers, but actively facilitated, sanctioned, and integrated their institutional resources into the unlawful seizure.

48a. The Whiteboard Booking and Institutional Confusion: When Plaintiff was initially forced into the intake booking area, the Crawford County Jail staff explicitly questioned

Defendant Officer Joe Sutton regarding the nature of the criminal charges. Defendant Sutton verbally responded, "two counts of interference," providing no written citation or active warrant to justify the arrest. The Crawford County Jail personnel then transcribed Plaintiff's name and these verbal charges onto a whiteboard located directly behind the intake booking desk.

48b. As additional jail staff were in room throughout the booking and reviewed the whiteboard, they explicitly voiced surprise and confusion regarding the origin of the arrest, initially assuming Plaintiff must have been an outside transfer inmate from neighboring Cherokee County, Kansas. Upon subsequently learning that it was, in fact, the City of Cherokee Police Department that executed the original warrantless arrest and transported Plaintiff across city and county lines, the jail staff explicitly expressed surprise. This institutional reaction provides definitive proof that the question of jurisdiction was immediately obvious to the detention officers, yet the Crawford County Jail willfully proceeded to accept custody and enforce a 50-hour incommunicado detention.

48c. Post-Booking Verbal Taunts: Following the whiteboard entry, Defendant Officer Joe Sutton prepared to leave the facility. Plaintiff initiated a vocal challenge to Defendant Sutton's lawless conduct, stating: "Oh, you're leaving? I have a question for you. Are you happy?" Defendant Sutton replied: "Happy for what?" Plaintiff responded: "Happy for what you've done to me." Defendant Officer Joe Sutton explicitly confessed his bad-faith personal animus and retaliatory motive, stating: "Of course I'm happy to enforce the law." Plaintiff noted: "Looks like you only enforced your feelings." Defendant Officer Joe Sutton hostilely issued a calculated taunt explicitly confirming his retaliatory intent to

punish Plaintiff for demanding a supervising officer on the public highway right-of-way, stating verbatim: "That 'call your supervisor' bullshit only works on YouTube."

48d. The Hastily Written Citation and Signature Forgery: Following this verbal exchange, Defendant Officer Joe Sutton left the booking area and subsequently returned only after administrative booking was fully completed to manufacture a retroactive paper trail. Defendant Sutton hastily drafted a municipal citation containing two counts of "Interference with Law Enforcement" and one count of "Pedestrian on Highway." The mandatory court appearance date of December 16, 2025, was entered on the front face of the instrument, positioned directly above the mandatory Defendant Signature line. Bypassing standard procedural mandates, Defendant Sutton never asked Plaintiff to sign the instrument, nor did he provide any opportunity for Plaintiff to execute a signature. Instead, Defendant Sutton willfully forged and entered the text "In Custody" directly across the mandatory Defendant Signature line to bypass Plaintiff's signature.

48e. The Angrily Scribbled Execution and Fine Blackout: On the reverse face of the manufactured citation, within the designated "Fine and Cost" administrative processing box, Defendant Officer Joe Sutton angrily and heavily scribbled the text "MUST APPEAR" completely across the parameter fields. This tactical scribble was executed to intentionally block out standard traffic infraction fine metrics, ensuring Plaintiff would be stripped of the ability to clear the pedestrian infraction administratively and forcing an unconstitutional, face-to-face mandatory appearance inside their compromised municipal forum.

48f. Premeditated Evidentiary Blackout: Defendant Officer Joe Sutton intentionally deactivated his body-worn camera prior to executing this post-booking confrontation,

citation fabrication, and delivery. This deliberate deactivation was executed for the explicit, bad-faith purpose of enforcing an absolute administrative blackout, preventing a formal electronic record of his lawless admissions, his physical signature forgery, and the Crawford County Jail staff's explicit recorded confusion over his presence from entering future federal judicial review.

G. The Arraignment and the 50-Hour Weekend Judicial Blackout

49. From 4:00 p.m. on November 22, 2025, until 6:44 p.m. on November 24, 2025, Plaintiff was subjected to a continuous, warrantless, and illegal incommunicado detention lasting exactly 50 hours and 44 minutes without any judicial determination of probable cause being rendered, thereby violating the 48-hour constitutional limit established in County of Riverside v. McLaughlin.

50. Later that evening, while held in the intake processing unit of the Crawford County Jail, Plaintiff explicitly requested to speak to the Sheriff or a magistrate to facilitate an active, pre-set bond and address the lawless nature of the warrantless arrest.

50a. Degrading Intake Processing and Sanitary Deprivation: During the intake processing phase at the Crawford County Jail, facility personnel subjected Plaintiff to arbitrary, punitive restrictions designed to inflict maximal physical discomfort and psychological degradation. Staff stripped Plaintiff of his personal attire and flatly prohibited him from wearing his own black underwear, citing a standard, unwritten, and facially arbitrary facility policy permitting only white undergarments. Because the facility refused to provide alternative baseline sanitary garments, Plaintiff was forced to endure the entire 50-hour and 44-minute incommunicado detention completely stripped of underwear beneath his outer uniform.

50b. Deliberate Fit Maliciousness and Severe Skin Irritation: Crawford County Jail personnel intentionally issued Plaintiff a standard orange corporate jumpsuit that was excessively oversized by several dimensions. The uniform hung loosely from Plaintiff's frame, heavily bunched up around his limbs, drastically restricted his physical mobility, and continually rubbed against his bare skin. This rough, ill-fitting garment caused severe, persistent physical skin irritation and abrasions across Plaintiff's body upon executing any basic physical movements, amplifying the punitive nature of the warrantless hold.

50c. Concrete Floor Housing and Worn Mat Deprivation: Upon forcing Plaintiff into the secure housing pod on the evening of Saturday, November 22, 2025, Crawford County Jail detention staff explicitly directed and permitted Plaintiff to sleep directly on the bare concrete pod floor utilizing only a severely worn, deteriorated gym mat. Plaintiff was forced to endure these sub-human bedding conditions on the cold, hard concrete slab for at least the initial night of his unconstitutional confinement.

50d. High-Stress Placement and Extreme Sleep Deprivation: To maximize psychological distress, Crawford County Jail personnel placed Plaintiff into a volatile, high-stress cell block alongside approximately twenty (20) individuals suffering from severe, un-medicated substance withdrawal and related distress. Throughout the entire 50-hour lockup, Plaintiff was subjected to extreme, torturous sleep deprivation directly caused by the Crawford County Jail's custom of maintaining high-intensity security lighting and unmitigated, constant operational noise from the pod and neighboring cell blocks, severely compromising his physical health and immune stability ahead of his eventual release.

50e. The Inmate Mattress Relinquishment: Witnessing this deliberate structural degradation, a

concerned inmate within the pod ultimately broke rank out of basic human compassion and voluntarily surrendered his own top metal bunk assets to Plaintiff to get him off the concrete floor. The rigid metal bunk offered negligible physical relief or structural comfort to Plaintiff's frame.

51. The Fabricated Bond Blackout and Intercom Fraud: Upon Plaintiff's initial booking, Crawford County Jail staff explicitly misinformed Plaintiff's primary relative, falsely stating that there was "no bond" available for Plaintiff's immediate release. Throughout the entirety of the 50-hour hold, Plaintiff utilized the cell intercom system approximately every two waking hours to directly inquire with Crawford County Jail staff regarding his bond status. Every single time, jail personnel uniformly and falsely responded "no bond." Plaintiff was forced to remain in absolute administrative isolation, completely unaware that an active bond had been set until the moment of his physical release.

51a. Corroborated Inmate Eyewitness Testimony: This systematic withholding of bond information and denial of due process was directly witnessed by the aforementioned fellow inmate housed in the immediate pod area. This independent material eyewitness personally observed Plaintiff's ongoing, futile attempts to obtain his release parameters over the intercom. On multiple occasions, this fellow inmate proactively used the intercom system to inquire with Crawford County Jail staff on Plaintiff's behalf, receiving the exact same fraudulent "no bond" response from the guards.

51b. Independent Roster Discovery and Cash Mandate: Bypassing the Crawford County Jail's informational block, Plaintiff's relative independently accessed the Crawford County Jail inmate roster website on the afternoon of November 24, 2025. The official public booking page openly displayed Plaintiff's name, mugshot, Saturday booking timestamp,

the two fabricated interference charges, and a pre-set bond amount of $2,500.00. Plaintiff's relative immediately called the jail facility to state that she was bringing a check to pay Plaintiff's bail. Crawford County Jail personnel did not mention the $2,500.00 amount, but flatly stated that they don't take checks and it had to be paid in physical cash currency. On the morning of Monday, November 24, 2025, Plaintiff's relative also initiated an emergency call to the Crawford County Judicial Center Clerk, who explicitly stated that standard administrative procedure required an arrestee to be brought before a judge for a formal bond hearing within 48 hours of a warrantless arrest.

51c. The Emergency Cash Withdrawal and Bank Paper Trail: Driven by severe chronological urgency with the business day ending, Plaintiff's relative rushed to her financial institution minutes before closing. She executed an emergency withdrawal of $2,500.00 in physical cash, explicitly confiding to the bank teller that the withdrawal was required to secure a cash bond for an unlawfully detained family member, securing a precision-timestamped bank receipt which she still retains.

51d. The Inclement Weather Transit: Plaintiff's relative immediately undertook a hazardous transit of over 25 miles in severe, inclement weather from her residence in Cherokee County to the Crawford County Jail facility in Girard, Kansas. Upon arrival and entering, Plaintiff's relative discovered a completely empty lobby with no staff present, and no directional or informational signage. She received no immediate assistance by Crawford County Jail staff over the inside east lobby door intercom when she described her predicament and intent to post bond.

51e. The Lobby Entry and Intake Staff Surprise: Ultimately two compassionate jail kitchen staff members broke administrative rank, bypassed the gatekeeping posture, and

eventually accommodated Plaintiff's relative in the secure facility lobby. When executing the bond transaction, the relative delivered the entire $2,500.00 cash sum physically in her hand to two arriving Crawford County Detention Officers. Plaintiff's relative never saw or received any bond sheet, exposing that the facility standardly utilizes bond-blocking tactics to deter immediate releases. Plaintiff was finally released from the unconstitutional 50-hour hold at 6:44 p.m. on Monday, November 24, 2025.

51f. The Pre-Retention Cell Phone Notice and Initial Blackout: On Tuesday, November 25, 2025—exactly one day following Plaintiff's physical release from the unconstitutional 50-hour hold—Plaintiff and his primary relative utilized a mobile telephone number provided by a local bail bondsman to directly contact Defendant Attorney Jacob Conard. Defendant Conard was initially verbally irate at having a prospective client contact him on his personal cell phone line. Plaintiff and his relative immediately apologized and explained the administrative origin of the bondsman's directory.

51g. The Cellular Directive and Immediate Text Compliance: Defendant Conard calmed slightly and explicitly instructed Plaintiff to immediately transmit his name and pending criminal charges via text message directly to his cell phone, and further directed Plaintiff to call his corporate office staff to schedule an in-person consultation. Plaintiff immediately complied with the directive, transmitting his full name and the fabricated City of Cherokee municipal charges via text message to Defendant Conard's cell phone, and left a scheduling message with his office staff that same day.

51h. The Structural Office Brush-Off and the Myers Alternative: Plaintiff waited until the morning of Wednesday, November 26, 2025, and proactively called Defendant Conard's office staff a second time to secure the consultation. Staff dismissively instructed Plaintiff

to wait for a return call and refused to offer an appointment. Having received zero return phone calls or electronic communications from Defendant Conard's office by the morning of Monday, December 1, 2025, and with the statutory arraignment deadline looming, Plaintiff was forced to bypass the non-responsive firm. Plaintiff immediately engaged the office of Defendant Attorney Robert E. Myers, executing formal retention and paying a $750.00 cash fee that same afternoon, unaware that both firms would ultimately operate as adverse state agents in an ongoing civil rights conspiracy.

51i. The Local Bar Network Lockout and Structural Isolation: On the morning of Wednesday, November 26, 2025, facing an ongoing informational blackout from Defendant Conard's office, Plaintiff and his relative initiated a sequence of urgent telephonic inquiries to multiple local law firms across the Crawford County region to secure immediate constitutional counsel. Every single independent firm contacted either flatly refused to return the emergency communication or actively declined to engage, demonstrating a widespread local legal landscape that systematically leaves unconstitutionally detained citizens isolated from active defense representation.

51j. The Financial Prerequisite and Forced Retention Shift: Driven by this comprehensive bar lockout, Plaintiff proactively contacted the firm of Defendant Attorney Robert E. Myers that same afternoon as a last remaining alternative. Staff explicitly notified Plaintiff that the firm would not take any administrative action or engage on the case until a flat fee of $750.00 was paid entirely up front. Faced with an absolute communication blackout from all local channels and standard holiday office closures, Plaintiff reluctantly returned to the firm on Monday, December 1, 2025. Plaintiff executed the formal hiring contract and surrendered the required up-front $750.00 retainer in cash that afternoon, completely

unaware that Defendant Myers would instantly utilize his position to enter into a backroom, collusive defense-prosecution huddle designed to run out Plaintiff's speedy trial clock.

51k. Day-One Delivery of the Core Factual Matrix: Concurrently with the execution of the formal hiring contract on Monday, December 1, 2025, Plaintiff hand-delivered an exhaustive, comprehensive written statement detailing every current recollection of the November 22nd, 2025 law enforcement pedestrian interception incident by Defendant Officer Joe Sutton and two responding Crawford County Deputies, the Cherokee and Crawford County border crossings at US400 and K7 highway, and the 50-hour unconstitutional detention directly into the physical custody of Defendant Attorney Robert E. Myers.

51l. Day-One Delivery of the Historical Animus: Shortly after the delivery of the Core Factual Matrix, on December 2, 2025, Plaintiff hand-delivered an exhaustive, comprehensive written statement detailing every current recollection of the October 25, 2024 scooter stop, the Crawford County Jail threat, and illegal detention directly into the physical custody of Defendant Attorney Robert E. Myers.

51m. Premeditated Malicious Gatekeeping and Advocacy Sabotage: Consequently, from the absolute inception of his retention on December 1, 2025, Defendant Myers possessed subjective knowledge of the multi-agency police profiling, the warrantless vehicle entry, and the physical threats issued on scene. His subsequent decisions to cancel hearings behind Plaintiff's back, file unauthorized continuances, curatively withhold the digital files from Plaintiff, and aggressively assert that the situation was caused by Plaintiff's "attitude" rather than law enforcement misconduct were executed with full, premeditated

awareness of the true factual record, proving an intentional, malicious operation to sabotage his own client's defense and protect the City of Cherokee municipal revenue engine from civil liability.

51n. Dual Eyewitness Notice and Day-One Delivery of Relative's Sworn Statement: Simultaneously with the physical hand-delivery of Plaintiff's statement on Monday, December 1, 2025, Plaintiff also placed into the direct physical custody of Defendant Attorney Robert E. Myers the complete, comprehensive witness statement executed by Plaintiff's primary relative, Michele M. Weber, which was fully current as of December 1, 2025. This structural document painstakingly detailed her firsthand rescue of the endangered companion animal, the multi-agency family-blocking of the vehicle assets, the intercom hostility from Crawford County Jail booking personnel, and the emergency cash withdrawal process.

51o. The Extent of Premeditated Conspiratorial Knowledge: Consequently, from the literal inception of his retention on "Day One," Defendant Myers possessed a complete, uncontradictable dual-witness factual record proving the full circle of City of Cherokee municipal and Crawford County liability. His subsequent actions to implement a total communication blackout, file secret continuances behind Plaintiff's back, and actively threaten Plaintiff with a "guaranteed conviction" to force a fraudulent plea deal on September 11, 2026, were executed with absolute, subjective knowledge that both the client and his primary relative had already permanently anchored the true facts in writing on December 1, 2025, cementing his role as an active, malicious co-conspirator operating to insulate state actors from civil rights exposure.

52. The Deficit of Information and Counsel's Unilateral Continuance: On December 1, 2025,

Plaintiff explicitly confirmed his correct electronic mail contact parameters with Defendant Attorney Robert E. Myers (hereinafter "prior counsel"). Despite possessing clear open lines of communication, prior counsel went behind Plaintiff's back on December 9, 2025, and unilaterally filed a motion for continuance with the City of Cherokee Municipal Court without Plaintiff's knowledge, authorization, or consent. Prior counsel willfully withheld this and all subsequent official court filings from Plaintiff, keeping him in absolute administrative isolation.

52a. The January 7th Video Preservation Mandate: On the morning of January 7, 2026, Plaintiff transmitted an explicit electronic mail directive to Defendant Attorney Robert E. Myers, providing definitive notice of vital third-party commercial evidence and demanding immediate collection metrics. Plaintiff wrote verbatim: "Be advised that Labette Bank of Cherokee has a security camera that faces east and should have been recording the entire interaction if within view, and especially once the interaction moved to the location of my vehicle. My vehicle was parked directly in view of the camera. I figured we would have obtained the body and dash camera video by now."

52b. The Fraudulent "Normal Process" Pacification Template: Later that afternoon on January 7, 2026, Defendant Attorney Robert E. Myers transmitted an electronic response designed to pacify the client and mask the ongoing multi-agency recording blackout. Defendant Myers wrote verbatim: "We have requested the body cam/dash cam footage but we have not yet received it. There is a process of how all of this works. The time frame on the process so far is normal and not unreasonable."

52c. The Premeditated Legal Trap: This written assertion stands as a definitive record of bad-faith misrepresentation. While Defendant Myers was actively lulling Plaintiff into

compliance by branding a month-long evidence blackout as "normal," he was concurrently working behind Plaintiff's back to file unauthorized continuances. This strategy curatively withheld the raw electronic files from his own client, allowing the municipal forum to quietly exhaust Plaintiff's constitutional speedy trial limits.

53. The December 15th Deceptive Trial Deflection: On December 15, 2025—exactly one day prior to the mandatory City of Cherokee Municipal Court date printed on the face of the underlying citation—Plaintiff telephonically contacted prior counsel's office to verify his attendance requirements. Prior counsel's staff explicitly instructed Plaintiff not to appear at the City of Cherokee Municipal Court courtroom due to a continuance, offering zero further legal or procedural explanation. Plaintiff immediately transmitted an electronic mail communication directly to prior counsel demanding confirmation. Prior counsel responded confirming the instruction to stay away, but intentionally suppressed all context or documentation regarding the scheduling change. Other than Defendant Officer Joe Sutton's report, Plaintiff never physically received a single City of Cherokee Municipal Court file or filing notice regarding these changes until January 21, 2026.

53a. The Lack of Administrative Record: On the morning of January 20, 2026, immediately upon reviewing the email, Plaintiff telephonically contacted Defendant Myers' office staff to challenge the assertion. Defendant Myers' own office staff explicitly confessed to their own administrative deficit, stating flatly that they possessed absolutely no record or log of any appointment being scheduled for January 12th, exposing the email as a manufactured pretext to shift blame onto the client.

53b. The 3:53 PM Emergency Phone Call and Immediate Profanity: At approximately 3:53 PM on the afternoon of January 20, 2026—a mere two hours prior to a mandatory

criminal court docket—Defendant Myers' office staff initiated a frantic telephone call to Plaintiff, casually announcing for the very first time that Plaintiff was required to appear at the Cherokee Municipal Court at 6:00 PM that evening. When Plaintiff rightfully challenged the gross unprofessionalism of a two-hour notice, the staff member placed Defendant Robert E. Myers directly onto the active line.

53c. The Extortionate and Profane Defensive Posture: Upon taking the phone, Defendant Attorney Robert E. Myers aggressively launched into an adversarial, profane tirade to suppress Plaintiff's criticism, hostilely demanding: "Are you trying to say my girls fucked up?" Plaintiff directly rebuked the hostility, stating that the notification pattern was highly unprofessional and reminding Defendant Myers that Plaintiff had placed his absolute legal trust in his hands.

53d. The Deceptive "Stay Away" Directive Exposed: Realizing his administrative neglect had been completely exposed, Defendant Myers shifted to a deceptive pacification tactic designed to keep Plaintiff and his third-party eyewitness away from the courtroom. Defendant Myers stated that if Plaintiff was so upset and lacked the time to coordinate transit for his relative, Defendant Myers would simply appear on Plaintiff's behalf and that Plaintiff "really didn't have to go to court that evening." Plaintiff flatly rejected the directive to stay away, stating he would immediately consult his primary relative and that they would both attempt to arrive on time.

53e. The 4:08 PM Scramble and Emergency Cross-County Transit: Immediately after hanging up, at exactly 4:08 PM, Plaintiff telephonically contacted his primary relative, apprised her of Defendant Myers' profane timeline and deceptive stay-away directives, and initiated an emergency scramble. The relative undertook an immediate 20-minute drive to

Plaintiff's residence, collected Plaintiff, and executed a rapid cross-county transit to the Cherokee Municipal Court. Bypassing Defendant Myers' bad-faith gatekeeping, Plaintiff and his witness successfully entered the courtroom and took their seats in the gallery at approximately 5:00 PM, establishing a physical presence a full sixty (60) minutes before the scheduled call to order.

54. The Non-Refundable Fee Extraction: To secure representation, Plaintiff paid Defendant Attorney Robert E. Myers a total of $750.00 cash, under a contract explicitly designating $500.00 of the sum as "not refundable due to his knowledge and expertise." Despite pocketing this retainer, Defendant Myers never provided a single itemized billing statement or invoice, instead utilizing his positions to quietly file unauthorized continuances and actively sabotage Plaintiff's civil rights claims.

55. The Suppression of County Video Evidence: On January 4, 2026, immediately following a delayed receipt of the basic police report, Plaintiff electronically contacted prior counsel to issue an explicit demand for the preservation and collection of all video evidence recorded by both responding Crawford County Sheriff's deputies, noting that the on-scene audio explicitly confirmed that both deputies were actively recording the interception. Prior counsel initially acknowledged, but ultimately completely suppressed the mandate. On January 20, 2026, as they were exiting the courthouse, Plaintiff heavily pressed Defendant Myers on the status of the missing Crawford County Sheriff's Office video files. Prior counsel dismissively stated that he "had just gotten the videos that day." To this date, neither Defendant Myers, Defendant Conard, nor the City of Cherokee municipal court has ever produced a single frame of recording generated by the Crawford County Sheriff's Office.

56. The Multi-Agency Recording Blackout and Spoliation Trap: Despite the total withholding of all County Sheriff recordings, the bad-faith, multi-agency conspiracy is explicitly captured on the municipal entity's own rear-seat cruiser camera and unmuted portions of the arresting officer's bodycam. Upon the physical arrival of the two Crawford County Sheriffs deputies, Defendant Officer Joe Sutton is captured on active video approaching the deputies and stating verbatim: "Here's what I've got on him." Immediately following this statement, the officer abruptly deactivated his body-worn camera entirely to prevent a legal record of their multi-agency retaliation agreement.

57. The Muted Vehicle Inspection and Initial Contact: Following the abrupt deactivation, the video recording arbitrarily resumes but is completely muted as the municipal officer and both Crawford County deputies circle Plaintiffs locked, stationary vehicle, peering through the glass windows while gesturing toward the interior assets. The recording's audio is only manually reactivated at the precise second the municipal officer opens his rear cruiser door to initiate the armed, joint-custodial physical transfer, proving an intentional, highly coordinated manipulation of electronic evidence to mask an illegal vehicle search and asset conversion from federal judicial review.

58. The Pre-Session Kangaroo Court and Extra-Procedural Banter: On January 20, 2026, Plaintiff and his primary relative arrived early for the scheduled 6:00 p.m. evening session of the Cherokee Municipal Court. Upon entering the courtroom, Plaintiff and his witness observed a total absence of judicial decorum and neutral administration. The presiding municipal judge was actively engaging in idle banter, casual conversation, and joking with Defendant Prosecutor Mary Jo Goedeke and an unrelated criminal defendant. Shortly thereafter, Defendant Officer Joe Sutton and the local Police Chief arrived

escorting a prisoner, immediately joining the un-recorded, casual banter with the prisoner in open view of the gallery.

59. The Secret Early Adjudication and Lack of Formal Order: While Plaintiff was sitting in the gallery waiting for the official court session to begin, prior counsel arrived and immediately entered into a private conversation with the Prosecutor and the Judge. Fully aware that it was more than thirty (30) minutes before the mandatory, publicly scheduled 6:00 p.m. call to order, the municipal judge abruptly declared to the room: "Let's get Gregory Weber taken care of." There was no formal call to order, no official opening statement of rights, and no recording equipment activated, establishing that the municipal court actively operates as a compromised, extra-procedural forum designed to quietly isolate and process targeted individuals outside standard constitutional protections.

59a. The Immediate Courtroom Banter and Total client Lockout: Upon entering the courtroom facility at approximately 5:00 PM, Plaintiff and his relative observed that the individual whom they now know to be Defendant Attorney Robert E. Myers was physically absent from the room. After several minutes, a well-dressed man, now identified as Defendant Myers, entered the room. Rather than searching for, executing a private consultation or reviewing strategy with Plaintiff, Defendant Myers immediately and enthusiastically joined into the casual, un-recorded courtroom banter, laughing and joking with Defendant Prosecutor Mary Jo Goedeke and the presiding Municipal Judge. Defendant Myers sat laughing and conversing with the state actors for several minutes, almost completely ignoring the presence of Plaintiff and his relative sitting dirctly adjacent from him in the gallery.

59b. The Forced Gallery Introduction: Plaintiff only discovered his Defendant Myers' identity

after hearing an unrelated third party inside the room call Defendant Myers by name. Plaintiff immediately stood up from the gallery bench at the first available opportunity, walked over to introduce himself to the laughing Defendant Myers, and returned to his seat. Defendant Myers never once invited Plaintiff to sit near him, never requested a private huddle, and completely refused to discuss a single line of legal strategy away from the court before launching into the 30-minutes-early secret adjudication at the bench.

60. The Charging Record Vacancy: Immediately following this informal huddle, Defendant Prosecutor Mary Jo Goedeke explicitly stated before the Court that the prosecution did not actually possess a physical copy of the underlying misdemeanor citation, attempting to advance a state-level criminal prosecution without an active charging instrument. Although Plaintiff possessed his own complete, original copy of the citation in his immediate physical custody, he maintained his constitutional right to silence. Defendant Officer Joe Sutton volunteered to scan his records, eventually locating his own copy to patch over the prosecution's structural failure.

61. The Fraudulent Document Backdating and Clerk Forgery: On January 21, 2026, Plaintiff finally received physical copies of the purported court filings from prior counsel's office. Upon immediate review, Plaintiff discovered an explicit, administrative fraud hardcoded onto the record: the "Order for Discovery" contained a written submission date of "_ December 2025," yet featured an official court clerk file-stamp reading "January 9, 2025"—a chronological impossibility.

62. Digital Metadata and Fabricated Scans: Furthermore, electronic metadata analysis of these identical court filings revealed they were processed via a PDF scanner hardcoded with a scan generation date of "July 31, 2017"—fully eight years prior to the alleged

offense. This mathematical and digital paradox provides uncontradictable physical proof that the City of Cherokee Municipal Court Clerk and Defendant Prosecutor Mary Jo Goedeke are actively generating fraudulent, backdated dockets and utilizing recycled templates to retroactively cover up their total lack of active charging paperwork.

62a. The Absence of Judicial Signature and Identity Concealment: To further insulate the municipal actors and mask the unlawful, extra-procedural nature of the proceedings, none of the ostensible court filings or orders received by Plaintiff on January 21, 2026, contain the physical, electronic, or handwritten signature of any named, identifiable judge. Instead, the mandatory judicial signature lines on these backdated instruments feature only the generic, typed block text "Municipal Judge." This total vacancy of a named judicial signature on official, file-stamped criminal discovery orders constitutes a structural abdication of judicial accountability, providing further physical proof that the City of Cherokee Municipal Court operates entirely outside standard constitutional safeguards as an un-recorded, anonymous administrative engine.

62b. The Structural Case-Number Mismatch and Heading Concealment: To further expose the administrative fabrication of the file, the documents contained within the purported record feature an irreconcilable structural mismatch between the underlying incident report and subsequent court filings. The official police report authored by Defendant Officer Joe Sutton on November 23, 2025, is cataloged under Case Number 2025-15 and lists the official report type strictly as an "Investigation."

62c. This initial incident report features a completely blank Defendant Information block at the heading—conspicuously omitting Plaintiff's name, date of birth, age, or any identifier, with Plaintiff's name only mentioned deep within the narrative body of the text.

Conversely, every single subsequent motion, plea form, and discovery paper generated by the prosecutor-defense conspiracy features a completely separate, hand-written Case Number reading 2025-139.

62d. Widespread Template Recycling and Digital Forgery: This spatial and numerical conflict provides definitive proof that the City of Cherokee Police Department did not possess an active, valid criminal docket tracking Plaintiff's pedestrian stop. Every single court document in Exhibit F—with the sole exception of the blank-headed investigative incident report and Defendant Myers' subpoena—features the identical, hardcoded digital scan timestamp reading "July 31, 2017." This universal 2017 marker proves that Defendant Prosecutor Mary Jo Goedeke and the City of Cherokee municipal court clerk actively pulled old, pre-scanned administrative templates from an unrelated seven-year-old file and hand-wrote the manufactured case number "2025-139" on top of them to retroactively simulate an active criminal prosecution.

62e. The Strategy of Paperwork Proliferation and Non-Compliance: To complement the backdated dockets, the record demonstrates a calculated pattern of filing boilerplate "Motions for Continuance" and un-executed "Motions for Production of Evidence." These motions were generated by Defendant Attorney Robert E. Myers and Defendant Prosecutor Mary Jo Goedeke not to advance a legitimate defense, but to manufacture a dense paper trail of administrative activity. This strategy allowed the defendants to slide by on generic form letters and automated motions to exhaust the state-level statutory speedy trial clock, while simultaneously withholding the actual, raw electronic files from Plaintiff. These motions feature the identical, facially defective "Municipal Judge" typed block lines completely devoid of any named judicial signature or verifiable oversight,

proving they were utilized strictly as unilateral tools of administrative delay.

63. Despite the state's clear inability to produce a valid charge and the court's failure to hold a mandatory probable cause hearing, prior counsel made zero procedural motions, raised no oral or written objections to the lawless, backdated nature of the paperwork, and actively acquiesced to the gridlock. After a brief discussion, a subsequent hearing date was set for March 17, 2026. Plaintiff was then rapidly escorted out of the courtroom by his attorney before the public session could even begin, completing a highly orchestrated maneuver to prevent the systemic procedural failures from entering the formal public record.

H. The First Attorney's Collusion and Extortion (The February 24th Smoking Gun)

64. On January 27, 2026, Plaintiff and his relative attended a discovery review meeting at Defendant Robert E. Myers' office. Defendant Myers engaged in a highly calculated campaign of evidence curation and gaslighting, showing Plaintiff only brief, edited video clips. Defendant Myers falsely claimed that the missing audio on the officer's initial approach was merely a "standard activation issue," skipped entirely past the officer's extra-jurisdictional border crossing, and focused exclusively on the scene where the backup deputy issued physical violence threats. Defendant Myers then backtracked to focus on the scene where Plaintiff was unlawfully arrested by Defendant Officer Joe Sutton. Defendant Myers flatly attempted to shift liability onto Plaintiff, repeatedly remarking that Plaintiff's vocal protests and conduct were "troubling," while dismissively suppressing vital third-party gas station surveillance video by claiming "it wouldn't show much."

64a. The January 27th Evidence Tampering and Discovery Substitution: During this January 27 meeting, Plaintiff presented Defendant Attorney Robert E. Myers with Plaintiff's

personal, working copy of the police report, which Plaintiff had heavily highlighted to isolate and denote what he believed were complete, actionable lies and factual fabrications authored by Defendant Officer Joe Sutton. In a calculated maneuver to disarm the client, suppress active criticism of law enforcement, and eliminate a physical record of the client's defense strategy, Defendant Attorney Robert E. Myers physically confiscated Plaintiff's highlighted copy of the public record. Defendant Myers refused to return the annotated document, instead forcefully substituting his own unmarked, pristine copy of the police report in its place. Defendant Myers explicitly stated to the Plaintiff and his relative that he would initiate a private request to Defendant Prosecutor Mary Jo Goedeke for a complete dismissal of the criminal charges, but conditioned this strategy by advising that Plaintiff might still be forced to pay full City of Cherokee municipal court costs as a mandatory condition for dropping the case.

64b. The Plain Subpoena Extraction and Corporate Isolation: To confirm the highly selective curation of the record, the documentation reveals that Defendant Attorney Robert E. Myers issued an undated, standalone subpoena to the commercial banking institution, which was file-stamped by the municipal clerk on January 27, 2026. This specific administrative instrument commanded the corporate banking entity to produce records within a strict fourteen (14) day window, resulting in a formal compliance response from the financial institution on February 11, 2026.

64c. The Selective Metadata Exclusion: Unlike every other subsequent discovery order, motion, or plea template generated by the prosecutor-defense conspiracy, this physical subpoena remains completely clear of the recycled July 31, 2017 digital scan date stamps, presenting a standard, contemporary plain scan file. This anomaly provides definitive

proof that when prior counsel and the prosecutor required legitimate third-party commercial records, they utilized active, modern administrative files; conversely, when generating fraudulent, backdated dockets to mask their lack of early charging paperwork or force coercive plea traps onto Plaintiff, they deliberately turned to the recycled, anonymous 2017 templates, exposing a bifurcated system of administrative fabrication.

65. In January 2026, prior counsel operated under standard procedural norms, stating to Plaintiff that he would be requesting a full dismissal of the charges from Defendant Prosecutor Mary Jo Goedeke. Defendant Myers explicitly stated that he would claim to the Prosecutor that available video evidence conclusively proved Plaintiff committed no unlawful acts.

66. The Prosecutor willfully refused to dismiss the charges, explicitly recognizing that a dismissal would expose the City of Cherokee and the Crawford County Sheriff's Office to substantial civil rights liability arising from the 50-hour illegal detention.

67. On February 24, 2026, prior counsel transmitted an electronic communication to Plaintiff detailing a collusive plea offer from the Prosecutor, explicitly quoting the Prosecutor as follows: "I can't dismiss the case. Mr. Weber has had numerous law enforcement encounters and the officers/deputies keep letting him off with a warning. That said, we would be amenable to a reasonable plea agreement. Disorderly with a $250 fine plus court costs, we do not have court services officers, so this would be unsupervised probation."

68. In the same communication, prior counsel actively abandoned his duty of zealous advocacy and acted as a structural agent for the prosecution, strongly urging Plaintiff to capitulate: "I recommend you take this offer... If this is accepted, we sign a piece of paper

and DO NOT have to go back to court. Just pay the court costs." This recommendation was a calculated legal trap designed to insulate the municipality under the Heck v. Humphrey doctrine.

69. On March 2, 2026, Plaintiff delivered an unequivocal electronic rejection of this scheme, stating: "I am still of the position that anything other than a complete dismissal of charges or a finding of not guilty is unacceptable. Why would it be considered 'reasonable' for me to first assert my innocence and then ultimately plead guilty to something I absolutely did not do? That's insane. I am not handing them a free and easy conviction and I am not going to let them give me a criminal record. I have committed no crime... Can you make any sense of the prosecutor's reasoning? What specific warnings are they referring to? I have no criminal history."

70. On March 6, 2026, Plaintiff called prior counsel's staff to demand immediate access to the case files. Staff explicitly admitted to active gatekeeping of the record, stating verbatim that they "would have to clear it with Robert before they could release anything" to their own client.

71. On March 10, 2026, Plaintiff received an electronic mail communication from prior counsel's staff titled “G. Weber Videos” with the description including, among others, “video footage from the Crawford County Sheriff's office” containing a Dropbox transfer link folder explicitly labeled as "CRSO vIDEOS" Upon accessing the digital folder, Plaintiff discovered a calculated administrative fraud: the folder contained zero actual recordings from the Crawford County Sheriff's Office. Instead, it contained only curated municipal police bodycam/dashcam files and private third-party surveillance footage from a local bank and gas station. Prior counsel and the prosecution deliberately mislabeled the

data to trick Plaintiff into believing he possessed the complete multi-agency file, while actively suppressing the highly damaging Crawford County Sheriff's Office recordings detailing the deputies' explicit physical threats.

71a. The Anonymous and Backdated Coercive Plea Instrument: This identical, lawless format was utilized on the wholly unsigned, backdated, and fraudulent "fake plea" document. Defendant Attorney Robert E. Myers' office suddenly produced this coercive instrument on the morning of September 11, 2026, aggressively requesting that Plaintiff physically sign it under the immediate threat of a "guaranteed conviction" at trial.

71b. The September 11th Bait-and-Switch Extortion Scheme: During this morning exchange, Defendant Attorney Robert E. Myers executed an active, deceptive bait-and-switch maneuver inside his office to recover physical custody of the incriminating document. While aggressively threatening Plaintiff with a "guaranteed conviction" if he refused to execute the plea, Defendant Myers suddenly produced a duplicate copy of the fraudulent, unsigned Journal Entry from his printer. Defendant Myers physically snatched the primary copy directly out of Plaintiff's hand and substituted the secondary duplicate copy in its place.

71c Prior to this physical extraction, Plaintiff had already successfully utilized his mobile device to capture high-resolution photographs of the original instrument produced by the office staff, permanently cementing the structural record. When Plaintiff unequivocally maintained his refusal to sign the secondary instrument, Defendant Myers escalated his extortionate posture, threatening to force an immediate, unprepared trial docket setting that morning to punish Plaintiff's non-compliance.

71d. Defendant Signature Vacancy and Client Flight: Plaintiff completely refused to capitulate

to the lawless duress, abruptly terminated the representation, and physically walked out of the office with the secondary duplicate copy of the unfiled Journal Entry securely in his possession. Upon thorough inspection, this instrument features a total due process vacancy, containing zero signature lines or spaces for the Defendant to sign, alongside the pre-typed execution line reading "_ June 2026" and the anonymous "Municipal Judge" block. It was this exact physical duplicate copy that Plaintiff hand-delivered directly to Defendant Attorney Jacob Conard mere minutes later during the emergency morning consultation.

72. On March 13, 2026, Plaintiff and his relative attended a confrontation meeting. When Plaintiff explicitly informed prior counsel that he had bypassed the curated trap, thoroughly reviewed the raw municipal and gas station files, and could point out the exact, definitive frames proving Plaintiff was walking legally on the highway shoulder facing traffic completely outside city limits, prior counsel's dismissive demeanor instantly shifted to visible panic. Realizing that his backroom conspiratorial agreement with the Prosecutor to force a plea had been completely exposed by the staff's inadvertent digital leak, prior counsel turned overtly hostile. Specifically, during this March 13, 2026 meeting, the Defendant Myers aggressively launched into a campaign to shift blame away from law enforcement, explicitly stating to Plaintiff that "this entire situation was not because of what [Defendant Officer Joe Sutton] did, but because of what you did." and " You and [Defendant Officer Joe Sutton] are both wrong " and "[Defendant Officer Joe Sutton] is a bully and an asshole, but he has every right to be a bully and an asshole."

72a. The Rodeo Profiling Admission: During this March escalation, Defendant Robert E. Myers explicitly relayed to Plaintiff and his relative that Defendant Prosecutor Mary Jo

Goedeke flatly refused to dismiss the charges, stating verbatim as her sole justification that "this wasn't your first rodeo with the police." This statement confirmed that the prosecution was willfully maintaining a meritless, retaliatory criminal case based entirely on historical profiling rather than active probable cause.

72b. The March 17th Trial Deception and Final Communication: On March 15, 2026—just days before the date of the scheduled City of Cherokee municipal court hearing—Plaintiff transmitted an explicit electronic mail demand to Defendant Attorney Robert E. Myers, requiring the immediate production of all case documentation and correspondences originating from the prosecutor. On March 17, 2026, Defendant Myers responded via electronic mail that morning, stating verbatim: "As soon as my office receives the paperwork, we will give you a call."

72c. The Total Advocacy Blackout and Hidden Journal Entry: At approximately 3:53 p.m. on the afternoon of March 17, 2026, Plaintiff received a telephonic communication from Defendant Myers' office staff. The staff member explicitly instructed Plaintiff not to appear at the City of Cherokee municipal courthouse that evening. When heavily pressed for a procedural explanation, the staff member explicitly stated that the firm was waiting on a "Journal Entry" from Defendant Prosecutor Mary Jo Goedeke, which would take "a day or three" to process.

73. This telephone call was directly overheard by Plaintiff's primary relative and constitutes the absolute final telephonic or electronic communication Plaintiff ever received from Defendant Myers' office prior to termination, permanently cementing a total, bad-faith advocacy blackout designed to suppress the unfiled June 2026 plea document.

74. On September 11, 2026, prior counsel resorted to outright extortion to force a closure of

the case before the federal filing window could open, explicitly threatening Plaintiff with a "guaranteed conviction" at trial if Plaintiff refused to sign an unsigned, unfiled plea agreement originally drafted in June. Plaintiff terminated prior counsel that morning.

I. Subsequent Counsel's Absorption into the Conspiracy

75. Initial Retention and Counsel's Execution Oversight: On the morning of September 11, 2026, immediately following the abrupt termination of Defendant Myers due to extortionate threats, Plaintiff and his primary relative initiated an emergency consultation at the office of Defendant Attorney Jacob Conard. During this initial consultation, Defendant Conard took physical possession of the fraudulent, unfiled "fake plea" document and thoroughly read it. Defendant Conard dismissively characterized the coercive instrument as a "standard plea deal." Plaintiff and his relative briefly apprised Defendant Conard of the multi-agency police retaliation and structural delays before concluding the morning session. Plaintiff and his relative returned to the office that afternoon to formalize retention and execute hiring agreements with staff. Subsequent counsel completely failed to retrieve the physical files from prior counsel's office mere blocks away. This meeting on September 11th and a subsequent consultation on September 29th represent the only two instances Plaintiff has ever met with Defendant Conard during the entire representation period.

76. The Record of Communication Blackout: Objective mobile telephone logs conclusively demonstrate that from the inception of retention on September 11, 2026, until Wednesday, October 7, 2026, Defendant Jacob Conard and his office staff initiated zero (0) telephone communications to Plaintiff with the sole communication from his office to Plaintiff being only one email informing him on September 15, 2026 that he was not on

the City of Cherokee municipal court docket that evening and that they would contact Plaintiff once a trial date had been set, failing to provide any further case updates despite Plaintiff's objections. This near total administrative abandonment occurred despite counsel possessing full knowledge that the state-level statutory speedy trial clock was actively expiring and that key evidentiary files remained suppressed.

76a. Current Counsel's Historical Blackout and Initial Notice: Plaintiff possesses direct evidence that Defendant Conard's structural communication failure dates back to the immediate aftermath of the initial arrest. On November 25, 2025—exactly one day following Plaintiff's release from the 50-hour hold—a call was placed to Defendant Jacob Conard's private cell phone utilizing a number obtained from a bondsman's directory. Defendant Conard became verbally irate that his private line was utilized; however, he explicitly instructed Plaintiff to text him his full name and pending charges, and directed all further inquiries to his office. Plaintiff immediately complied and transmitted his name and charges via text message. Despite possessing direct notice of the case parameters from that date forward, the attorney and his office staff completely ignored all subsequent communications and refused to return multiple phone calls throughout the subsequent ten months, leading directly to Defendant Conard appearing at the September 15, 2026 City of Cherokee municipal court session entirely blind without checking the active case docket or consulting his client.

77. The September 15th Written Directives and Early Warning Matrix: On the morning of September 15, 2026, Plaintiff transmitted an explicit electronic mail directive to Defendant Attorney Jacob Conard, providing definitive notice of the court's irregular customs and commanding immediate constitutional action. Plaintiff wrote verbatim:

"Good morning. I am writing to remind you that today is the third Tuesday of the month and the City of Cherokee Municipal Court should be convening at 6:00 pm. Based on my experience though, they convene at their convenience up to two hours early. Due to my pressing civil case timeline, it is imperative that you file an entry of appearance today and receive an order of dismissal on Constitutional grounds. If the court refuses, we must immediately request an evidentiary hearing and a trial de novo as soon as possible... This police report and the video will prove that the stop was invalid at its inception due to the officer's own admissions, fabricated claims, and Brady violations. Please let me know if you have any questions and please keep me informed immediately about the status and progress of my case, something prior counsel absolutely failed to do. I have come to you in good faith and am placing my trust in you." [files attached]

78. The Pre-Session Trial Deflection and Fraudulent Misrepresentation: On the afternoon of September 15, 2026—the precise date of the scheduled monthly evening session of the City of Cherokee Municipal Court—Plaintiff proactively initiated a telephonic communication directly to Defendant Jacob Conard's office staff to force an update. During this call, staff explicitly confirmed that they had received Plaintiff's secure video discovery link and his explicit, written email directives requiring counsel to move for an immediate constitutional dismissal or trial de novo in open court that evening.

79. However, in an intentional, deceptive maneuver to isolate Plaintiff and prevent him from witnessing the upcoming proceeding, Defendant Jacob Conard's staff falsely assured Plaintiff that his case "was not on the docket" for that night and explicitly stated that no physical attendance was required at the City of Cherokee municipal courthouse. Relying entirely on this fraudulent misrepresentation by his own legal counsel, Plaintiff did not

attend. Defendant Jacob Conard then secretly attended the September 15, 2026 evening City of Cherokee municipal court session behind Plaintiff's back to collude with Defendant Prosecutor Mary Jo Goedeke, actively hiding the proceeding from his own client to run out the federal statute of limitations clock. Instead of executing Plaintiff's mandatory directives to demand an immediate dismissal or trial de novo, subsequent counsel abandoned active advocacy, entered into a total communication blackout, and colluded with Defendant Prosecutor Mary Jo Goedeke to quietly advance the case to October 20, 2026, artificially exhausting Plaintiff's statutory speedy trial clock.

80. To secure subsequent representation, Plaintiff paid Defendant Attorney Jacob Conard a total of $1,500.00 under a contract dated September 11, 2026 ostensibly covering five (5) hours of legal work at a rate of $300.00 per hour. During the forced September 29, 2026 consultation, when heavily pressed on his absolute communication blackout and failure to file a speedy trial motion, Defendant Conard hostilely issued a financial ultimatum to Plaintiff and his relative. Defendant Conard stated that he "works by the hour" and that Plaintiff could either pay him to actively work on the case or pay him for his time spent communicating with Plaintiff, aggressively declaring that the ongoing grievance huddle was "probably going to burn up one hour just for the meeting." To date, Defendant Conard has failed to produce any itemized invoice or record of labor, proving that his billing practices function as a predatory extortion mechanism to suppress client oversight.

81. To cure Defendant Conard's ongoing structural neglect, Plaintiff physically walked into Defendant Conard's office on September 16, 2026, forcing staff to make physical copies of Plaintiff's personal file, including the bond sheet, bond receipt, and underlying citations.

82. On September 28, 2026, Plaintiff forced an end to the blackout by demanding a status update and emergency meeting. Defendant Conard's staff claimed total lack of knowledge regarding the case status.

83. On September 29, 2026, Plaintiff and his primary relative attended the forced in-person consultation at Defendant Conard's office. Defendant Conard falsely claimed a lack of discovery, stating he "only possessed the police report"—ignoring the physical documents copied by his staff on September 16, 2026.

84. When heavily pressed on the evidence, Defendant Conard trapped himself in a permanent administrative contradiction, explicitly admitting on the record that he had, in fact, thoroughly watched the leaked video discovery link sent on September 14, 2026.

85. Defendant Conard openly confessed that he fully agreed Plaintiff's case warranted a complete constitutional dismissal and an evidentiary suppression of the warrantless vehicle search, but hostilely defended his September 15, 2026 inaction by stating that a dismissal would not have happened on the 15th in court and wouldn't happen immediately.

85a. The Cell Phone Notice Confrontation and Evasive Preoccupation: During this same intense consultation on September 29, 2026, Plaintiff's primary relative directly confronted Defendant Attorney Jacob Conard with the historical fact of the November 25, 2025 pre-retention cellular contact and subsequent text compliance. Upon being explicitly reminded that his office had possessed active notice of Plaintiff's name and pending charges for ten full months, Defendant Conard became visibly preoccupied, shifted his posture, and demonstrated extreme reluctance to acknowledge the historical timeline. This evasive physical reaction and refusal to look at the Plaintiff or address his own text

message logs provides definitive physical evidence of cognitive dissonance, proving that Defendant Conard possessed full, subjective awareness that his long-term administrative neglect and complete communication blackout were deeply embedded across the entire history of the case.

86. When Plaintiff demanded immediate federal civil rights protections, Defendant Conard became combative, stating Plaintiff was "trying to tell him how to practice law," and openly admitted that the City of Cherokee municipal forum was a notorious "revenue court" that "operates the way they want to." This identically mirrored Defendant Robert E Myer's verbal assessments, proving a widespread systemic custom.

86a. The September 29th Handwritten Rejection Instrument and Admission: During this same combative consultation on September 29, 2026, Defendant Attorney Jacob Conard explicitly demanded to see the physical duplicate copy of the fraudulent, unsigned June 2026 Journal Entry that Plaintiff had taken from Defendant Myers' office. Defendant Conard thoroughly reviewed the instrument, walked to his office copier, and generated a secondary duplicate copy of the document, handing the original back to the Plaintiff. Defendant Conard then drafted a handwritten statement directly onto his copy of the instrument, stating that Plaintiff officially rejected the plea agreement, and hostilely insisted that Plaintiff physically sign this handwritten rejection to "protect against liability."

86b. The Mandatory Disclaimer Counter-Demand: Plaintiff rightfully exercised his right to contract, vocally objecting to the directive and stating that he could legally reject the fraudulent instrument by simply refusing to sign anything. When Defendant Conard aggressively insisted on a physical signature, Plaintiff issued a strategic counter-demand,

stating he would execute the rejection line if, and only if, Defendant Conard added a clear, explicit handwritten notation confirming that the underlying Journal Entry was entirely fraudulent, was never an official City of Cherokee municipal court document, and was never filed with any court of law.

86c. The Countersigned Electronic Exposure Trap: To secure Plaintiff's signature and advance the administrative blackout, Defendant Conard complied with the mandate, writing the explicit non-filed disclaimer notation onto the paper face of the instrument. Plaintiff executed his signature next to the notation. Defendant Conard then generated a copy of the annotated and signed document, handing a copy to the Plaintiff. Plaintiff immediately issued a verbal demand requiring Defendant Conard to countersign Plaintiff's duplicate copy of the instrument to legally validate the notation. Defendant Conard executed his physical handwritten signature onto Plaintiff's copy. Plaintiff walked out of the office with this executed copy securely in his possession, providing unassailable physical proof containing both printed handwriting and Defendant Conard's verified signature, conclusively capturing consecutive defense counsel establishing actual, on the record knowledge that the underlying state prosecution was operating on fabricated, unfiled instruments.

87. On the afternoon of September 29, 2026, Plaintiff electronically transmitted his entire court file alongside Defendant Myers' incriminating "too many prior warnings" email, permanently cementing Defendant Conard's possession of the record.

88. The Forced End of Blackout and Written Directive Demand: On the afternoon of Wednesday, October 7, 2026, Defendant Conard's staff initiated the sole telephonic communication of the entire retention period, offering zero legal updates and dismissively

stating only that Plaintiff had an upcoming court appearance on October 20, 2026, at 6:00 p.m. In immediate response to this ongoing structural neglect and verbal gatekeeping, Plaintiff transmitted a formal electronic mail directive to Defendant Attorney Jacob Conard on the evening of October 7, 2026, stripping the firm of its ability to hide dockets behind vague phone calls. Plaintiff explicitly commanded: "You are hereby instructed to document all past and future verbal requests and directives to me with written emails in addition to the voice call. All directives must be in writing. To be clear, you are instructed that all past, current and future directives and requests sent from your office to me regarding my case must be in writing in an email message to me in addition to any other method of communication."

88a. Defendant Conard's October 8th Written Deflection and Trap Admission: On the morning of October 8, 2026, Defendant Attorney Jacob Conard transmitted an electronic response that permanently trapped him in a record of long term nonperformance and misrepresentation. Defendant Conard explicitly confessed to his own 27-day total communication blackout, writing verbatim: "It is my understanding that this email is in response to my office contacting you yesterday to advise you of your upcoming court date on October 20, 2026 at 6:00 p.m. In Cherokee Municipal Court. It is my understanding this is the only 'past, current and future' directive sent or made by my office."

88b. The Premeditated Motion Fabrication and Scheduling Lie: To further insulate his neglect ahead of the federal filing, Defendant Conard included a calculated administrative misrepresentation in his October 8th correspondence, stating: "I am currently in the process of drafting the motions we discussed during your consultation on September 29, 2026 at my office. I anticipate these motions will be filed prior to your upcoming court

date and will be scheduled for hearing when we appear on October 20, 2026." This statement stands as an absolute, bad faith fabrication designed to pacify the Plaintiff; because Defendant Conard had already secretly advanced and stalled the case behind Plaintiff's back on September 15th to bleed out the speedy trial clock, his written anticipation of filing fresh, un-drafted motions mere days before the October 20th deadline provides definitive physical evidence of a continuous, collusive cover-up to run out Plaintiff's federal civil rights statutes of limitations.

89. As of October 20, 2026, exactly 315 calendar days have elapsed since Plaintiff's December 9, 2025 arraignment. This represents an unconstitutional, un-waived excess of 135 days beyond the strict 180-day statutory maximum allowed by K.S.A. 22-3402, meaning the state-level prosecution is structurally dead.

J. Corroborated Multi-Witness Verification Network

90. At all material times, including all in-person strategy meetings and formal consultations with Defendant Myers and Defendant Conard, Plaintiff's primary relative—a credible third party eyewitness—was physically present, maintained active access to all case files, and personally observed the systemic breakdown of advocacy and the January 27th, March 13th, and September 29th, 2026 "revenue court" admissions.

91. Plaintiff's primary relative personally witnessed all but a few telephonic communications initiated by Defendant Myers, overhearing the transition into hostile collusion. Furthermore, following Plaintiff's booking call, the primary relative proactively traveled 24.7 miles from her home to the unstaffed veterinary clinic located in the Crawford County seat to rescue Plaintiff's endangered companion animal from the exposure and abandonment executed by Defendant Officer Joe Sutton.

92. On Wednesday, October 13, 2026, Defendant Conard's staff delivered a dismissive court date announcement without providing professional advocacy. This interaction was personally overheard by Plaintiff's primary relative alongside two visiting relatives who, while not directly involved in the underlying traffic encounter, possess direct knowledge of the case history. Crucially, one of these visiting relatives maintains secure, off-site possession of an identical master backup set of all Plaintiff's evidentiary files, creating a verified, uncompromised chain of custody completely insulated from Defendants' ongoing records concealment.

K. Ongoing Statutory Obstruction and Severe Physical Injuries Sustained

93. On Wednesday, September 30, 2026, Plaintiff submitted a formal request under the Kansas Open Records Act (KORA) to the City of Cherokee municipal court clerk demanding copies of the official docket sheet and Plaintiff's complete case file. To date, the City of Cherokee municipal court has failed to comply with the mandatory 3-business-day response window required by state law, entering into a period of total non-cooperation.

94. In a subsequent written electronic communication, Plaintiff explicitly notified all relevant municipal actors and defense counsel that this matter is actively tracked by the United States Department of Justice under DOJ Tracking Number: 733419-FLZ, and that any continued withholding of public records would be formally construed as active concealment.

95. Despite receiving explicit notice of active Department of Justice oversight, Defendants have willfully maintained their silence, withheld public docket sheets, and refused to provide written notices of hearings, thereby engaging in an active, ongoing conspiracy to

obstruct justice, conceal evidence, and strip Plaintiff of access to the federal courts.

96. To date, the only administrative items Plaintiff has ever successfully received from the Crawford County Sheriff's Office are a basic bond sheet, a $2,500.00 cash bond receipt, and a standard property receipt. Defendants continue to willfully suppress and withhold all underlying county jail logs, cruiser dashcams, and body-worn recordings.

97. Severe Physical and Mental Injuries Sustained: As a direct result of the violent physical arrest executed by Defendant Officer Joe Sutton and the subsequent 50-hour incommunicado detention within the Crawford County Jail, Plaintiff sustained significant physical trauma and extensive, prolonged injuries. Plaintiff's shoulders were subjected to severe soreness and strain for the first few months following the arrest, an injury heavily exacerbated by a previous work-related left shoulder strain from years prior. Plaintiff further suffered an acute, sore back lasting for a duration of approximately one week post-release.

98. Systematic Medical Deprivation and Psychological Damage: Throughout the first month following his release from the absolute administrative blackout on November 24, 2025, Plaintiff suffered from sporadic, severe chest pains. The absolute physical exhaustion inflicted by the 50-hour incommunicado hold severely compromised Plaintiff's immune system, leaving him physically incapacitated by two severe colds—one in December 2025 and a second in January 2026—followed by a severe flu in February 2026. Furthermore, the immense psychological strain of the ongoing defense-prosecution conspiracy, hidden dockets, and structural isolation has caused severe, debilitating mental exhaustion that has extended continuously through the present day.

## IV. CAUSES OF ACTION

FIRST CAUSE OF ACTION

Unlawful Detention and False Imprisonment under 42 U.S.C. § 1983

(Against Sheriff Billy Tomasi in his individual capacity and official capacity as Sheriff of Crawford County, Kansas and of The Board of Crawford County Commissioners and; the City of Cherokee, Kansas)

99. Plaintiff realleges and incorporates by reference all preceding paragraphs.

100. Defendants, acting under color of state law, subjected Plaintiff to a continuous, warrantless, and illegal detention lasting approximately 50 hours and 44 minutes without a prompt judicial determination of probable cause, violating the Fourth Amendment.

101. This 50-hour deprivation was the direct result of an official policy, widespread custom, or deliberate indifference in training and supervision maintained by Defendants regarding the processing of warrantless arrestees during weekend hours, explicitly memorialized by jail staff refusing to review bond metrics on the Sheriff's "day off."

SECOND CAUSE OF ACTION

Warrantless Search and Seizure of Property under 42 U.S.C. § 1983

(Against Defendant Officer Joe Sutton in His Individual Capacity)

102. Plaintiff realleges and incorporates by reference all preceding paragraphs.

103. Defendant Officer Joe Sutton executed a physically invasive, warrantless entry into Plaintiff's locked vehicle and seized Plaintiff's wallet, cash, mobile device, and dog without consent, a warrant, or applicable exceptions.

104. As documented in Defendant Officer Joe Sutton's own report and cruiser recordings, this illegal search was used as the sole pretext to confirm identity on-scene, stripping the officer of qualified immunity for executing a clearly established constitutional violation

past county boundary lines.

THIRD CAUSE OF ACTION

First Amendment Retaliation under 42 U.S.C. § 1983

(Against Individual Defendants Officer Joe Sutton, Deputy Kosman, and Deputy Moutz)

104a. Plaintiff realleges and incorporates by reference all preceding paragraphs.

104b. Plaintiff was engaged in a constitutionally protected activity at all material times during the November 22, 2025 encounter by exercising his absolute right to verbal criticism of law enforcement, demanding the presence of a supervising County Sheriff, and exercising his right to walk away from a non-mandatory community caretaking check.

104c. Defendants responded to Plaintiff's protected speech by executing a violent physical arrest, a warrantless property search, and an invasive entry into an enclosed personal travel bag behind heavily tinted windows. These actions would chill a person of ordinary firmness from continuing to engage in protected speech or criticizing local authority.

104d. The causal connection between Plaintiff's protected speech and the subsequent severe enforcement actions is explicitly hardcoded onto the face of the record through the defendants' own verbal admissions. This includes Officer Sutton admitting the arrest was driven by Plaintiff's "attitude" and "crap about calling the Sheriff", Deputy Kosman explicitly stating he was "not putting up with [Plaintiff's] bullshit" because Plaintiff tried to "call [Sutton] out", and Deputy Moutz actively encouraging the property extraction by declaring, "He's taking everything you've got." These statements permanently strip the individual officers of qualified immunity.

FOURTH CAUSE OF ACTION

Fourteenth Amendment Deprivation of Access to the Courts under 42 U.S.C. § 1983

(Against Defendants Prosecutor Mary Jo Goedeke, Attorney Robert E. Myers, and Attorney

Jacob Conard)

105. Plaintiff realleges and incorporates by reference all preceding paragraphs.

106. Defendants willfully and maliciously coordinated a systemic withholding of public records, case files, and prosecutor correspondences, defying both a formal Kansas Open Records Act (KORA) request and explicit notice of active United States Department of Justice oversight under DOJ Tracking Number: 773419-FLZ.

107. This intentional suppression of files and bad-faith manipulation of the state-level speedy trial clock—which has now extended to an unconstitutional 315 calendar days—was executed for the explicit, singular purpose of running out the strict 2-year statute of limitations under K.S.A. § 60-513, thereby structurally destroying Plaintiff's capability to seek judicial redress.

FIFTH CAUSE OF ACTION

Failure to Intervene and Retaliatory Historical Profiling under 42 U.S.C. § 1983

(Against Defendants Deputy Kosman and Deputy Moutz In Their Individual Capacities)

108. Plaintiff realleges and incorporates by reference all preceding paragraphs.

109. Defendants Deputy Kosman and Deputy Moutz were physically present on the scene and possessed a realistic, immediate opportunity to intervene to prevent the City of Cherokee municipal officer Defendant Joe Sutton from executing an extra-jurisdictional, warrantless arrest and vehicle entry.

110. Instead of protecting Plaintiff's clearly established constitutional rights, the individual deputies actively joined the retaliation. Defendant Deputy Kosman executed an unauthorized historical query to expand the enforcement action based entirely on a history of "verbal warnings," and explicitly issued an armed threat of physical violence to a fully

handcuffed, seatbelted captive "We can do this out here on the ground if you want", directly violating the Fourth and Fourteenth Amendments. Defendant Deputy Moutz explicitly provided institutional backing for the warrantless Fourth Amendment trespass by declaring: "He can empty your pockets, you're under arrest" and "He's taking everything you've got."

111. Defendant Deputy Kosman explicitly disclaimed his independent constitutional duty to intervene, stating verbatim on the active multi-agency recording: "Whatever happens to you is entirely up to Joe Sutton," while reinforcing their joint custodial agreement by stating, "Let me know if you need anything at the jail."

V. STRUCTURAL BYPASS OF STATE PROCEEDINGS

(Overcoming the Younger Abstention Doctrine)

112. Plaintiff has exhausted all reasonable efforts to seek adjudication within the City of Cherokee municipal court.

113. Because the City of Cherokee municipal forum is systemically compromised, operates via an unconstitutional weekend judicial blackout, denies statutory records requests, and utilizes consecutive collusive defense attorneys as adverse state agents to suppress evidence, the state proceeding provides zero adequate opportunity to raise federal claims. The Younger abstention doctrine is completely inapplicable due to the bad-faith, retaliatory, and fraudulent nature of the ongoing City of Cherokee municipal operation.

VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants, jointly and severally, awarding the following relief:

• A. Compensatory damages against all Defendants in an amount to be determined at trial for

constitutional deprivations, severe emotional distress, skin abrasions, and the unlawful asset conversion of Plaintiff's vehicle and private property;

• A-1. Specific property damages against Defendant Officer Joe Sutton for the unconstitutional, warrantless physical intrusion into Plaintiff's private travel baggage and the exploitation of closed personal effects tucked behind heavily tinted windows;

• B. Full restitution and immediate return of the $2,500.00 cash bond unlawfully extracted and withheld under the false pretext of a structurally dead state prosecution;

• C. Full disgorgement, restitution, and return of all unearned legal fees extracted by Defendant Robert E. Myers ($750.00) and Defendant Jacob Conard ($1,500.00) under false pretexts and in furtherance of the civil conspiracy;

• D. Punitive damages against all individual Defendants in their individual capacities for their malicious, reckless, and oppressive conduct;

• E. A declaratory judgment stating that the policies, customs, and conspiratorial actions of the Defendants violated the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; and

• F. Any further relief this Court deems just, equitable, and proper.

JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 19, 2026

Respectfully submitted,

GREGORY JACOB WEBER, Plaintiff Pro Se
490 E 520th Ave.
785-320-0196
gregmeisterweber@gmail.com